Matt Wadsworth, Bar No. 12268
Brian Arnold, Bar No. 12019
ARNOLD & WADSWORTH, PLLC
Attorneys for Plaintiff(s)
955 East Chambers St. Suite 220
South Ogden, UT 84403
Tel: 801-475-0123
Fax: 801-475-0393

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Brant T. Boyer<br><br><br>Plaintiff(s)<br><br>vs.<br><br>Frontier Bank FSB, Tuhaye Sales and Marketing L.L.C., Talisker Club, LLC., Tuhaye Finance, L.L.C., Coalition Title Agency, Tuhaye Home Owners Association, LLC<br><br>Defendant(s) | **FIRST AMENDED COMPLAINT**<br><br>Jury Trial Requested<br><br><br>Civil No.<br><br>2:11-cv-00204-SA<br><br>Judge: Tena Campbell |

Plaintiff, Brant T. Boyer, by and through counsel, and hereby complains and alleges as follows:

## <u>PARTIES</u>

1. Brant T. Boyer ("Boyer") a married man residing in the state of Utah and rightful owner of the vacant lot located at Lot 3N-13, Tuhaye Phase 3 North, 9885 North Uinta Drive, Heber City, Utah 84032 (the "Property")

2. Talisker Club, L.L.C. is licensed to do business in the state of Utah.

3. Tuhaye Sales and Marketing L.L.C. ("Seller") a licensed company in the state of Utah.

4. Tuhaye Finance, L.L.C. ("Lender") is doing business in the state of Utah.

5. Coalition Title Agency ("Title") a licensed company in the State of Utah.

Boyer Complaint 2.0

6. Frontier Bank, FSB ("Current Lender") a licensed company in the state of Utah. Frontier Bank was assigned the Note and Deed of Trust on February 7th, 2006.

7. Tuhaye Home Owners Association, LLC is a licensed company in the State of Utah.

## JURISDICTION

8. This Court has jurisdiction over the subject matter of this action pursuant to § 78A-5-102, Utah Code Annotated.

## VENUE

9. Venue is proper in this case pursuant to §78B-3-301, Utah Code Annotated.

# GENERAL ALLEGATIONS

10. In or around September of 2005 Boyer entered into a "Purchase and Sale Contract" with Tuhaye Sales and Marketing, LLC (Seller) regarding Lot 3N-13, Tuhaye Phase 3 North Subdivision, 9885 North Uinta Drive, Heber City, Utah 84032 for a sales price of $475,000. Sales Price included Membership to Talisker Club in the amount of $100,000. Brant T. Boyer signed as Buyer and Mark Thorne signed as Vice President of Talisker Sales and Marketing, Inc., a Utah corporation and sole manager for Seller Tuhaye Sales and Marketing, LLC., a limited liability company.

11. Pursuant to the Real Estate Purchase Contract, page 2 of 14, #4 TALISKER CLUB MEMBERSHIP INCLUDED, Buyer was required to pay a $100,000.00 "Membership Deposit to Talisker Club regardless if Buyer chooses to activate the Membership or not." The $100,000.00 Membership was included in the sales price and if Buyer chose not to activate Membership, Buyer would not be entitled to any reduction in the Purchase Price, or any refund of the Membership Deposit.

Boyer Complaint 2.0

12. On or around September 14, 2005, Boyer paid to Coalition Title Agency an earnest money deposit of $47,500.00, which representatives of Coalition Title said was non-refundable. On or around October 3, 2005 Coalition Title delivered to Boyer a letter stating they had received the check for the earnest money.

13. Settlement occurred on November 15, 2005 at Coalition Title. The grantor on the Warranty Deed is Tuhaye Sales and Marketing, LLC.

14. Under the Deferred Purchase Money Note, Boyer executed a note in favor of Tuhaye Finance, LLC in the amount of $332,500.00. Interest was charged at a yearly rate of 6.500%. Payments are to be made quarterly in the amount of $5,403.12 payable at Tuhaye Sales & Marketing, LLC c/o Tommy Auger, P.O. Box 4349, Park City, Utah 84060, or at a different place if required by the "note holder."

15. Under the Note, page 4 of 5, above the signature line of Mark R. Thorne, Vice President for Tuhaye Finance, LLC, it says "Pay to the order of Frontier Bank, FSB without recourse:" Frontier Bank was not a party in this transaction at inception, and appears to be the assignee of the note.

16. Tuhaye Finance, LLC. ("Lender") failed to register and obtain a license, at the time of executing the loan, with the Division of Real Estate or any other Utah agency as a licensed lender. See, U.C.A. § 61-2c-101 *et. seq.*

17. Seller provided a binder containing the by-laws of the homeowner's association after the parties closed the loan transaction, which had the following language: "3. R*esale of your lot may be difficult or impossible, since you may face the competition of our own sales program and local real estate brokers may not be interested in listing your lot."* This binder was not provided to Boyer until approximately 60 days after the closing date.  Boyer never would have been provided these bylaws he would not have closed on this transaction.

Boyer Complaint 2.0

18. The Interstate Land Sales Act protects consumers from fraud and abuse in the sale or lease of land. In 1968, Congress enacted the Interstate Land Sales Disclosure Act ("ILSA"). Patterned after the Securities Law of 1933, the ILSA requires land developers to register subdivisions of 100 or more non-exempt lots with HUD and to provide each purchaser with a disclosure document called a "Property Report." The Property Report contains relevant information about the subdivision and must be delivered to each purchaser before the signing of the contract or agreement. Boyer did not receive any such property report from Seller until 60 days after the closing date. The Subdivision here has roughly 300 lots.

19. Deed of Trust was assigned to Frontier Bank FSB on 02/07/2006. Assignment references a different lot and legal description as well as the subject property.[1]

20. Frontier Bank FSB is the assignee on the Deed of Trust transferred on 02/07/2006, recorded as Entry No. 296382, in Book 827 at Page 793, Wasatch County Recorder's Office and Tuhaye Finance, LLC was the assignor.

21. Seller and its real estate agents and mortgage representatives represented to Boyer, through advertisements, disclosures and verbally that the subdivision would contain certain amenities. However, the amenities listed as "Phase 2" have not been completed.  Since acquiring the property, the homeowners association has charged association fees without providing many of the actual promised amenities.  The amenities were material to Boyer's decision to buy the lot and are required to be completed in exchange for payment of the homeowner's dues.

22. Representations by Tuhaye Sales and Marketing, LLC concerning the true value of the lot and the amenities caused a significant financial hardship for Boyer.

23. In an effort to mitigate losses and in lieu of Defendants failure to provide the amenities and timely disclosures contracted for by Boyer efforts have been made by Boyer to modify or otherwise work with Frontier, the current note holder.  Boyer entered into modification

---

[1] 15 U.S.C. §1641(d)(1)

Boyer Complaint 2.0

negotiations with Frontier Bank on 12/02/2008.  Frontier then demanded additional collateral and pledges from Boyer.

24. On or about September of 2007 Boyer engaged the services of Realtor Debbie Marino to sell the lot since Frontier refused to modify the loan terms.

25. Realtor Marino cancels the listing due to her inability to properly market and or show the property based on the resistance and failed cooperation of Talisker's Real Estate Representatives.

26. The undisclosed tying arrangements put in place by defendants include shared commissions. The binder, referred to supra, also required any outside agent to pay a referral fee to one of Tuhaye's "preferred" real estate agents.

27. Sometime after closing on the transaction, Talisker Club, LLC and Tuyahe Sales and Marketing, LLC trespassed on to Boyer's lot and removed all the foliage as well as dirt.  The Lot looked horrible and was difficult to show for this reason.

28. Boyer never entered into a contract to build on the lot; nor has there ever been a contract to build on the lot by any party.

29. In a letter to Boyer dated May 11, 2010 Realtor Debbie Marino describes the listing as:

> "very frustrating to say the least and a total exercise in futility.
> First of all, Talisker tried to force all outside listing agents to sign a
> co-listing contract that gave them 15% of the sellers agent
> commission. If you did not sign said contract they made things
> very difficult for selling agent and would not promote or show
> their property. My Broker would not allow any agent from Summit
> Sotheby to enter such a contract which as I stated before made life
> very difficult when working with Talisker. To make matters worse,
> they removed sellers lot # signs and all the stakes, so it was
> impossible to tell what the exact dimensions of the lots were.
> When I questioned Talisker about this practice, I was told the signs
> were recycled to their new lots that they just released. There was
> absolutely no co-operation whatsoever, and really made trying to
> sell your lot impossible. This was not a good working environment
> for an outside realtor or for their client who wanted to sell their
> property".

Boyer Complaint 2.0

# FIRST CAUSE OF ACTION

## 15 U.S.C.A. § 1 et. seq.

## AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC.

30. All other allegations above are hereby realleged.

31. The Subdivision was advertised over the internet and channels of interstate commerce such as newspaper advertisements in other states, mails etc. to find prospective purchasers in other states.

32. This cause of action outlines how the Defendants, collectively, sought to restrict outside agents from selling the lots or homes within the Subdivision.  If outside real estate agents were hired, the bylaws contain a provision requiring the outside agent to pay a referral fee to the approved real estate agent brokerage.  If the fee was not agreed to, then the Defendants would control (i.e. limit) access to the Subdivision via the security team working the gate that accessed the Subdivision.  Defendants would also tear down advertising signs and rip them out of the lot.  This scheme creates a situation where the parties to any future sale of a lot within the subdivision would be forced to violate 24 C.F.R. § 3500.14 by paying a party who didn't perform any "settlement services"[2] during the transaction.  This forces any outside real estate agent hired by a lot owner within the subdivision to structure any future transaction to violate 24 C.F.R. § 3500.14.

33. Furthermore, the tying arrangement structured by Defendants violates 15 U.S.C.A. § 13(c) by forcing payment by the lot owner to pay a party who would not provide a service.[3]

---

[2] 24 C.F.R. § 3500.2 (definition of "settlement service" (14)  Rendering of services by a real estate agent or real estate broker)

[3] It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein

Boyer Complaint 2.0

34. Talisker/Developer/Real Estate Broker/Site Sales Managers (collectively referred to as "Monopolizers" in this cause of action) maintain a monopolistic practice of controlling all of the sales, listings and activities, which involve any efforts by Boyer, or any representative acting on his behalf to sell, convey, or transfer Boyer's interest in the Property.

35. All Monopolizers are "persons" within the meaning of 15 U.S.C.A. § 7.

36. Boyer has a private right of action to pursue this claim pursuant to 15 U.S.C.A. § 15.

37. Monopolizers engage in harassment, intimidation to force lot owners, including Boyer, to use their services.  Monopolizers reinforced their intimidation by tearing down the "For Sale" signs on multiple occasions and threats to block access to the subdivision. Such actions in addition to the tying arrangements (Monopolizers created a system where only certain players could fulfill the role of escrow agent, title insurer, appraisal, real estate agent, lender) between Monopolizes are "per se" violations of 15 U.S.C.A. § 1 et. seq.[4]

38. Defendants collectively schemed not to disclose to buyers, including Boyer, the mandatory referral fee before closing.  Defendants' enlisted a certain escrow officer and title agency, Coalition Title, which all buyers had to close with.  This escrow officer purposefully withheld the bylaws until after the closing occurred and failed to charge a settlement fee in violation of Utah law (See Cause of Action #6).  Another representative of Coalition Title instructed Boyer, after payment of the earnest money, that the earnest money was nonrefundable.

---

where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

[4] Three types of group boycotts have been recognized as per se violations of the antitrust laws:  (1) horizontal combinations among traders at one level of distribution, whose purpose is to exclude direct competitors, (2) vertical combinations among traders at different marketing levels, designed to exclude direct competitors of some members of the combination and (3) combinations designed to influence coercively the trade practices of boycott victims rather than to eliminate them as competitors.  *West Texas Utilities Co. v. Texas Elec. Service Co.*, N.D.Tex.1979, 470 F.Supp. 798

Boyer Complaint 2.0

39. Monopolizers ordered and arranged for appraisals through their approved appraiser in order to control prices and values.  Boyer was required to use this appraiser in further efforts by Monopolizers to control all the normal market influences and market conditions; and did so by creating misleading reports, disclosures and appraisals.  The appraisal was relied upon by Boyer in his decision to purchase the lot for the price he paid.

40. The requirement to pay a listing referral fee to Talisker/Developer and its Representatives when using an outside Broker creates an unfair market place and or imposes a penalty upon Boyer in selecting an "outside" Real Estate Broker.

41. This previously undisclosed requirement by Monopolizers creates a restriction of free trade and an otherwise tying arrangement as defined as follows: an "agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Systemcare, Inc. v. Wang Laboratories Corp.,* 117 F.3d 1137, 1139 (10th Cir. 1997); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958).

42. Here, the seller, Tuyahe Sales and Marketing, LLC required Boyer to use Coalition Title as well as use their real estate agent brokerage (or incur a penalty of 15%).  These conditions for the sale required Boyer to purchase other products from a select number of persons in violation of Federal law.  See generally, The Real Estate Settlement and Procedures Act, 12 U.S.C. 2601 et seq.; Regulation X, 24 C.F.R. § 3500 et. seq.

43. Monopolizers have a predicted outcome if an outside broker fails to agree to the shared listing fee and in that showing the property, marketing the property and properly advertising the property will be difficult.  Monopolizers codified this threat in the bylaws, which were hidden from Boyer purposefully until after closing (See, ¶ 16).

44. Boyer had no way of truly understanding the nature of the conspiracy between Monopolizers before purchasing the lot because he was never provided with any disclosures until after

Boyer Complaint 2.0

closing on the lot transaction and paying his illegal non-refundable downpayment. See, Causes of Action Five and Seven, infra.

45. Each Defendant actively conspired to destroy competition and restrict trade practices by binding all purchasers in the subdivision, including Boyer to engage services of Monopolizers for real estate services including but not limited to, real estate brokerages, title and escrow services, loan brokerages and appraisers. If Boyer hired an outside service, the outside party had to "share" in the commissions or earnings with Monopolizers, even where Monopolizers performed no services. Thus, Monopolizers created a scheme that would force any lot owner, including Boyer, to violate 24 C.F.R. §§ 3500.14-16, unless the lot owner agreed to use the approved real estate agent.

46. At no time before closing the transaction did Monopolizers disclose the binding obligations contained within the Covenants, Codes and Restrictions.

47. Monopolizers were not merely obtaining a return on their ownership interest or earning fees from the services performed because cash exchanged hands at closing, they were creating future mandatory earnings that they concealed from the HUD-1.

48. The relationship between Monopolizers to preclude competition, as shown more fully above, represents an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. The requirement of Monopolizers to use their services only or else face intimidation, represents a tying scheme, which also is a per se violation of 15 U.S.C. § 1. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 at 1028, 1030 (9th Cir. 1981). At the very least, the Monopolizers' scheme represents an attempt to monopolize all real estate transactions, sales etc. concerning the Subdivision.

49. As shown more fully above, Boyer has suffered from the tying arrangements and scheme to monopolize the Subdivision because he has not been able adequately market the Property properly through his selected Real Estate representative.

Boyer Complaint 2.0

50. This has damaged Boyer, because he could not sell the property at market rate due to the inhibitions of Monopolizers.  This has resulted in an added debt obligation and diminution in value of the property over time.

51. Boyer prays for injunctive relief to stop Monopolizers from stopping Boyer's real estate agent from marketing the property as well as actual damages, punitive damages and all statutory damages allowed pursuant to 15 U.S.C. § 1 et. seq.

## SECOND CAUSE OF ACTION

### SILENT FRAUD

### AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC., AND COALITION TITLE AGENCY

52. All other allegations above are hereby realleged.

53. Subject to supplementation after discovery, two main issues concerning material facts abound here; one, the Bylaws contain a provision requiring use of certain real estate agents or else pay a referral fee or suffer harassment; two, the construction timeline of the Phase 2 Amenities.

54. Seller and Boyer entered into a purchase contract for Lot 13, Tuhaye Phase 3 North, Phase II Subdivision on 9/14/2005.

55. The Seller had a contractual duty to supply the documents listed in Section 5 of the Purchase Contract.  See, *Elder v. Clawson*, 384 P.2d 802; 14 Utah 2d 379 at 382-383 ([s]ilence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances.) (emphasis omitted)

Boyer Complaint 2.0

56. Boyer initialed the proper areas of the purchase agreement showing that he was in receipt of those documents, however, Seller told him to initial in the proper places but that Seller would provide them later that afternoon because Seller had to "make more copies."

57. Seller purposefully failed to provide the "copies" for five more months.

58. Seller required Boyer to use Coalition Title Agency in order to purchase the dwelling lot.  On information and belief this Seller required this because Seller and Coalition worked together to assure Boyer would not receive a copy of the Bylaws and CCR's. The escrow officer for Coalition Title Agency also represented that there were no material provisions in the Bylaws or CCR's different than the norm.  This was in fact false, as outlined more full above.

59. At all times, Seller represented that there were no provisions in the Bylaws or CC&R's that were outside the norm.  This was not true. The two issues mentioned above were material to the transaction and if Boyer knew beforehand he would not have continued on with the transaction.

60. Boyer is unable to seek adequate representation from any outside real estate agents because of the requirement to pay Talisker/Developer's preferred vendor a broker fee creates an undue, undisclosed, ongoing and relevant concealment of a material nature.  Boyer's hired agent, as mentioned above, faced harassment, destruction of property and other active actions on the part of the "approved" agents while trying to advertise and sell the lot.

61. The CCR's and Bylwas were a material part of the transaction.

62. Boyer reasonably relied on the representations of the escrow officer and Seller.

63. As a result, Boyer was unable to sell the property at a higher price from the time of mid 2007 until now subjecting himself to added debt obligations.

64. Boyer prays for damages in the amount of the difference between the fair market value at the time the lot was listed for sale in mid 2007 and the value of the property now, plus punitive damages, attorney's fees and costs.

Boyer Complaint 2.0

## THIRD CAUSE OF ACTION

### FRUADULANT CONCEALMENT

## AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC., AND COALITION TITLE AGENCY

65. All other allegations above are hereby realleged; specifically, the allegations in Cause of Action #2.

66. Seller knew about the provisions in the Bylaws concerning the real estate referral fee and the lack of a timeline in the Phase 2 amenity build-out.

67. Seller instructed Boyer to sign the purchase contract and initial receipt of documents but purposefully withheld those documents from Boyer until months after the closing occurred.

68. The representations and provisions in the Bylaws were important facts concerning Boyer's decision, and if he had known what the provisions were he never would have closed on the transaction knowing that the Phase 2 Amenities did not have a formal timeline.

69. Boyer has been unable to use his elected real estate agent to sell the property because of harassment and property damage by the "approved real estate agents."

70. As an escrow officer, Coalition Title had a duty to provide a copy of the CCR's and Bylaws before closing.

71. Also, Boyer has paid over $25,000 in home owners associate dues and association and Tuyahe, LLC has failed to meet its obligations diminishing the value of the lot for resale. The contract language makes it possible that the Phase 2 Amenities will never be built making the Amenities in Phase 2 illusory:

> The construction of Phase 2 Amenities listed under "Phase 2 Amenities" is
>
> subject to the sole discretion of Tuhaye LLC, a Utah limited liability company
>
> ("Tuhaye LLC") and neither Tuhaye LLC nor Company make any representations
>
> as to when, if ever, the Phase 2 Amenities will be built. (underline added)

Boyer Complaint 2.0

72. The CCR's and Bylwas were a material part of the transaction.

73. Boyer reasonably relied on the representations of the escrow officer and Seller.

74. Boyer prays for actual damages, rescission of the contract or specific performance as well as attorney's fees, costs and punitive damages.

## FOURTH CAUSE OF ACTION

### FALSE STATEMENT OF FUTURE PERFORMANCE

### AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND

### MARKETING LLC

75. All other allegations above are hereby realleged.

76. Seller instructed Boyer to initial the purchase contract with the promise to deliver the documents Boyer initialed that he was in receipt of.  Seller never intended to actually deliver the promised documents lest the poor provisions in the Bylaws would be discovered and Boyer not close.

77. Seller made the promise to deliver the documents-while not actually delivering them-for the specific purpose of deceiving Boyer about the provision in the Bylaws and concealing the real estate listing fee requirement and that the builder never really intended to build the Phase 2 items that Seller marketed specifically to induce Boyer to purchase the lot.

78. Boyer prays for actual damages, rescission of the contract or specific performance as well as attorney's fees, costs and punitive damages.

## FIFTH CAUSE OF ACTION

### CIVIL CONSPIRACY

### AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND

### MARKETING LLC, COALITION TITLE AGENCY, AND FRONTIER BANK FSB

79. All allegations above are hereby realleged.

Boyer Complaint 2.0

80. Tuhaye L.L.C., Tuhaye Finance, L.L.C., Tuhaye Sales and Marketing, LLC., Coalition Title Agency and Frontier Bank FSB represent an association of more than two or more persons.

81. The unlawful objection for this conspiracy comes in the form of:

    a.  The conspiracy between the Defendants was and continues to be to prohibit all outside competition from other real estate agents, brokers and title companies from closing on any lot transaction in the Subdivision.

    b.  To inflate values of the lots by using one appraiser.

    c.  The conspiracy between the Defendants is to force lot purchasers into purchasing services from Coalition Title Company and Tuyahe Sales and Marketing, LLC or face harassment, monetary harm or not purchase a lot.

    d.  The conspiracy between the Defendants is to hide from lot purchasers the Bylaws governing the subdivision until after a buyer closes on the purchase transaction thereby violating the purchase agreement's substantive provisions and escrow instructions.

    e.  The conspiracy is to  create confusion for buyers by representing that the earnest money is nonrefundable regardless of the Seller's breach-which is true for some breaches but not for all.

    f.  The conspiracy to violate the ILSA outlined in Cause of Action #7, which is an unlawful purpose.

    g.  The conspiracy to violate 15 U.S.C.A. § 1 et. seq.

82. The unlawful objective is fulfilled by the agreement, understanding, or "meeting of the minds" which is inferred from the actions on the part of each defendant to violate certain rules governing their respective industries in order to control all transactions that occur in the Tuhaye subdivision.  *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 791 (Utah Ct. App. 1987).[5]

83. In short, the scheme was to create multiple alter egos of the same company; namely, Tuhaye, LLC., Tuhaye Sales & Marketing, LLC and Tuhaye Finance, LLC and Tuhaye, LLC, and to

---

[5] "[I]t is not necessary in a civil conspiracy action to prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence.  Instead, *conspiracy may be inferred from circumstantial evidence*, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators."

Boyer Complaint 2.0

have these companies along with Coalition Title, Frontier Bank, FSB to unload their vacant lot inventory in violation of the ILSA and Utah law, as shown more fully above.

84. Coalition violated its escrow instructions and the ILSA by telling Boyer that his earnest money was nonrefundable in order to force him into the transaction.

85. Seller lied about its true intentions to provide the Bylaws immediately after Boyer executed the purchase agreement and closing documents.

86. Appraiser violated USPAP and misrepresented the true value of the lots in order to produce inflated appraisals to justify the lot offering prices and for which buyers would rely on for value.

87. Frontier Bank, FSB, had an unlicensed lender, Tuhaye Finance, LLC to act as a straw lender in order to escape liability as the original lender and gain the possible defenses of a holder in due course.  The real lender in this transaction was Frontier Bank, FSB with Tuhaye Finance, LLC acting only as a table funding lender/broker.[6]  Therefore, Frontier Bank, FSB does not have the added protections of a holder in due course.  Furthermore, Frontier Bank, FSB was aware of entire scheme and never disclosed to Boyer the material facts of the transaction.

88. All Defendants are jointly and severally liable.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE PURSUANT TO U.C.A. § 31A-23A-101 et. seq.

## AGAINST COALITION TITLE AGENCY

89. All other allegations above are hereby realleged.

---

[6] *Lender* means, generally, the secured creditor or creditors named in the debt obligation and document creating the lien. For loans originated by a mortgage broker that closes a federally related mortgage loan in its own name in a table funding transaction, the lender is the person to whom the obligation is initially assigned at or after settlement. A lender, in connection with dealer loans, is the lender to whom the loan is assigned, unless the dealer meets the definition of creditor as defined under "federally related mortgage loan" in this section. See also § 3500.5(b)(7), secondary market transactions. 24 C.F.R. § 3500.2

Boyer Complaint 2.0

90. Coalition Title Agency, LLC (hereinafter "Coalition"), did not charge a settlement fee to Boyer for closing the loan transaction.  Coalition has a duty to charge a fee pursuant to U.C.A. § 31A-23A-101 et. seq. and Utah law.  The Code takes the position that if no fee is charged there is some type of mischievous behavior afoot by the title and escrow companies and one or more of the parties involved in the transaction.  In other words, the Code attempts to guard ignorant consumers, like Boyer, from those in the industry that seek to hide certain things about a transaction in order to get business.

91. Here, Coalition hid the fact that the alleged seller on the purchase sale agreement was not the owner of record creating the situation of a flip transaction such that equity could be skimmed and to gain future business acting as a coconspirator to hide the Bylaws and the fact that the earnest money was refundable under certain conditions.

92. Coalition also hid the Bylaws and CCR's and went along with Seller to conceal them in order to get the title insurance business.  On information and belief Coalition did not charge the required fee to induce Boyer to not question the requirement of Seller to close with Coalition.

93. Boyer prays for all damages allowed pursuant to U.C.A. § 31A-23A-101 et. seq.

## SEVENTH CAUSE OF ACTION

## INTERSTATE LAND SALES FULL DISCLOSURE ACT

## AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC.

94. All allegations above are hereby realleged.

95. The Interstate Land Sales Full Disclosure Act, hereinafter referred to as the ILSA, requires warning disclosures, an information booklet, and a statement of record be provided or made publicly available by developers and builders to non-commercial buyers of lots within a subdivision when no exemptions apply. No exemptions apply here.

Boyer Complaint 2.0

96. Boyer signed the purchase agreement and escrow instructions on September 14, 2005 and the Seller was listed on the purchase agreement as "Tuhaye Sales and Marketing, LLC" (Straw Seller) when in fact at that time the owner of record was actually Tuhaye, LLC (Developer) as listed on the title commitment dated September 13, 2005.  Boyer paid $47,500 in earnest money pursuant to this contract.

97. The purchase contract between Boyer and Tuhaye Sales and Marketing, LLC contains the usual provision governing remedies after reviewing certain material documents such as Bylaws, CC&R's etc.

98. The purchase contract allows the buyer to cancel the transaction in certain circumstances except that the contract terms do not give a right to cancel if Boyer does not agree with certain provisions in the Bylaws, CC&R's etc. The remedy provision does not give a remedy to Boyer in this circumstance. Therefore, the earnest money is non-refundable if Boyer dislikes the Bylaws, CC&R's etc.

99. A rejection of the title abstract is the only remedy that allows Boyer to cancel the agreement and to get his earnest money back.

100.    Unless the method of disposition is adopted to evade the ILSA, non-refundable payments are allowed under the ILSA when, in pertinent part: (See, 15 U.S.C.A. § 1702(a))

    a.   The subdivision contains less than 25 lots.

    b.   The lot is improved and already has a house built on it or the sale of the land under a contract obligating the seller to erect a house on lot.

101.    None of these exemptions apply here.

102.    The ILSA has no exemptions where a method is adopted by the developer and its associates to usurp the Statute.

103.    Tuhaye Sales and Marketing, LLC never disclosed that it was not the owner of record.

Boyer Complaint 2.0

104.    Coalition Title Agency violated trust account procedures on October 3, 2005 by delaying the deposit.

105.    Tuhaye Sales and Marketing, LLC was not the "seller" in this transaction, it was merely just a conduit used by Developer, Tuhaye LLC to usurp the ILSA.

106.    As outlined in this complaint, Tuhaye is a "subdivision" and contains a "common promotional plan" under ILSA. 15 U.S.C. §§ 1701(3), (4).

107.    Tuhaye is listed on HUD's website with "id #30876" and as having 147 approved lots yet under the "General Information" listed as page 2 in the back of the "Brown Binder" states that the report covers 175 lots which does not align with HUD's registration.

108.    The "Brown Binder" provided to Boyer states: "In the event you default under your purchase agreement prior to closing, we will keep your non-refundable deposit as liquidated damages or we may elect to pursue additional lawful remedies available to us."

109.    This provision was in direct conflict and contradiction to the ILSA and the provisions explicitly prohibited as it relates to collection of advance non-refundable deposits.  The ambiguities arise from page 3 of the purchase agreement from August, 2005 whereby it states "Buyer shall have twenty-one (21) calendar days following Mutual Acceptance to read and review these materials (the "Due Diligence Period").  If no written objection to the above-described materials is given by Buyer to Seller within twenty-one (21) day period, they will be deemed acceptable to Buyer."  The "Straw Seller" (Tuhaye Sales and Marketing, LLC) was not even on title during the 21 day "Due Diligence" period, yet Straw Seller had already obligated and told Boyer that earnest money deposits were non-refundable and retained the same.

110.    These representations were made to mislead and confuse Boyer about his true rights under the law and the contract, and did in fact mislead him.

Boyer Complaint 2.0

111.     Boyer made efforts to cancel the transaction by contacting Coalition Title, but the title company representative told Boyer that all his earnest money was nonrefundable.

112.     "Unless the method of disposition is adopted for the purpose of evasion of this chapter" different exceptions are allowed. 15 U.S.C. § 1702.

113.     Defendants colluded to adopt a method of disposition to evade ILSA. Specifically, Developer conspired to have their affiliated company, Tuhaye Sales and Mareting, LLC. to act as a Straw Seller to sell the property to Boyer.

114.     Developer and their Straw Seller (Tuhaye Sales and Marketing, LLC) commonly advertised and Boyer inquired in response to common advertisement to Developer about the purchase of Property.

115.     Developer required Boyer to negotiate the purchase with Straw Seller (Tuhaye Sales and Marketing, LLC) while Developer knowingly retained title to Property.

116.     Approximately two months after Boyer made the substantive decision to buy, Developer (Tuhaye, LLC) deeded title of the property to Straw Seller (Tuhaye Sales and Marketing, LLC) via a Special Warranty Deed on November 22, 2005 and then to Boyer via Special Warranty Deed on November 22, 2005, the same date.

117.     At no time would any prudent Buyer understand these material non-disclosures Defendants were required to give Boyer notice before executing the contract about the true nature and relationship of Seller, Straw Seller and the other Defendants, and for which no proper disclosures were provided prior to taking non-refundable deposits.

118.     The recruitment of Builder as a Straw Builder to sell properties on behalf and for profit sharing with Developer falls under a method of disposition purposed for evasion of the ILSA, and therefore this transaction specifically falls under the ILSA and no exemptions apply.

119.     In failing to provide a statement of record after closing, Developer is in violation of (1) (A) of this section of ILSA.

120.    In failing to provide a written property report, Developer is in violation of (1) (B) and (1) (C) of this section of ILSA.

121.    In employing a scheme to defraud Boyer of statutory rights under ILSA, Developer is in violation of (2) (A) of this section of ILSA.

122.    In making untrue statements about the lot ownership, Subdivision sales, and omission of a statement of record including but not limited to omission of profit sharing agreements and options to sell with builders, Developer is in violation of (2)(B) of this section of ILSA. In addition, Developer conspired with Straw Seller to procure nonrefundable fees without any right to cancel.

123.    Under 15 U.S.C. §. 1705 of ILSA:

The statement of record shall contain the information and be accompanied by the documents specified hereinafter in this section- (1) the name and address of each person having an interest in the lots in the Subdivision to be covered by the statement of record and the extent of such interest; (2) a legal description of, and a statement of the total area included in, the Subdivision and a statement of the topography thereof, together with a map showing the division proposed and the dimensions of the lots to be covered by the statement of record and their relation to existing streets and roads; (3) a statement of the condition of the title to the land comprising the Subdivision, including all encumbrances and deed restrictions and covenants applicable thereto; (4) a statement of the general terms and conditions, including the range of selling prices or rents at which it is proposed to dispose of the lots in the Subdivision…(6) in the case of any Subdivision or portion thereof against which there exists a blanket encumbrance, a statement of the consequences for an individual purchaser of a failure, by the person or persons bound, to fulfill obligations under the instrument or instruments creating such

Boyer Complaint 2.0

encumbrance and the steps, if any, taken to protect the purchaser in such

eventuality…

124.    Developer failed to provide this statement of record to Boyer and concealed this failure

by means of a method of disposition of the lots for the purposes of evasion of this Act.

125.    As shown more fully above, Developer and Straw Seller acted together to hide

information of the statement of record from Boyer.

126.    In hiding "the name and address of each person having an interest in the lots in the

Subdivision to be covered by the statement of record and the extent of such interest" *id*.

Boyer was damaged by being bound to a contract to pay homeowner's association fees for

products that have not and may never be built and that he may never be able to hire the real

estate agent he chooses.

127.    In hiding "a legal description of, and a statement of the total area included in, the

Subdivision and a statement of the topography thereof, together with a map showing the

division proposed and the dimensions of the lots to be covered by the statement of record and

their relation to existing streets and roads," *id*. Straw Seller and Developer hid the extent of

the Subdivision and range of sales comparables to deny Boyer the opportunity to realize that

the actual range of values of sales in the Subdivision provided by Straw Seller, which turned

out to be manipulated by Straw Seller's appraiser and false comparables.

128.    In hiding "a statement of the general terms and conditions, including the range of selling

prices or rents at which it is proposed to dispose of the lots in the Subdivision" *id*. Straw

Seller and Developer denied providing Boyer with the actual range of selling prices for the

Subdivision and the actual price of the lots on which to make an informed and prudent

buying decision.

Boyer Complaint 2.0

129.     In hiding blanket encumbrances,[7] Developer and Straw Seller hid the evidence of the scheme to avoid the ILSA.

130.     Boyer ended up paying an inflated amount for the lot based on false representations of value that were buttressed by false comparables and a purposefully inflated appraisal.

131.     Boyer wanted to cancel the transaction but lacked the knowledge that he had the right to do so before consummation.  Boyer suffered statutory damages, emotional distress, and health problems for the past 5 years relating to the stress and depression resulting from the loss of savings and Lenders refusal to mitigate losses without the requirement for additional collateral pledges.

132.     For conspiracy and statutory violations of the ILSA, Boyer prays for all damages allowed by ILSA plus costs, attorney's fees and interest. Boyer prays for damages of all types, of no less than $450,000 in actual damages, plus punitive damages.

## EIGHTH CAUSE OF ACTION

## BREACH OF CONTRACT

## AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC,

133.     All allegations above are hereby realleged.

134.     Plaintiff pleads in the alternative that Boyer could obtain his earnest money for a failure of Seller to provide the Bylaws.

135.     Coalition Title was given escrow instructions to govern the earnest money given by Boyer.  These escrow instructions (See, Cause of Action #7) contained in the purchase agreement contain certain provisions for breaches.  When Boyer was not given the Bylaws he

---

[7] A trust deed, mortgage, judgment, or any other lien or encumbrance, including an option or contract to sell or a trust agreement, affecting a Subdivision or affecting more than one lot offered within a Subdivision except that such term shall not include any lien or other encumbrance arising as the result of the imposition of any tax assessment by any public authority.

Boyer Complaint 2.0

sought to cancel the transaction.  The representative from Coalition Title told him that he could not do that and get his earnest money back.  Therefore, Boyer was forced to close on the lot because he stood to lose his significant investment.

136.    By failing to allow Boyer to obtain his earnest money when Seller failed to provide the Bylaws and other documents, Coalition Title breached the escrow instructions.

137.    This caused Boyer to be forced to purchase the lot, which turned out to be at an inflated amount, which has dropped in value significantly.

138.    Boyer prays for actual, consequential, special, incidental damages and attorney's fees and costs.

## NINTH CAUSE OF ACTION

## TRESPASS

## AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC,

139.    All allegations above are hereby realleged.

140.    Sometime after Boyer purchased the lot, Tuhaye Home Owners Association, LLC, Tuhaye Sales and Marketing, LLC and Talisker Club, LLC intruded onto Boyer's property without permission and removed from the lot all the foliage and a great deal of dirt from the lot.  Ed Rehell and Mark Chitwood acknowledged that they did in fact do this.

141.    The dirt has never been returned.

142.    Boyer prays for actual, consequential, special, incidental damages and attorney's fees and costs.

## TENTH CAUSE OF ACTION

## CONVERSION

## AGAINST TUHAYE LLC, TUHAYE FINANCE LLC, TUHAYE SALES AND MARKETING LLC,

Boyer Complaint 2.0

143.    All allegations above are hereby realleged.

144.    Tuhaye Home Owners Association, LLC, Tuhaye Sales and Marketing, LLC and Talisker Club, LLC removed dirt, land and all the foliage from Boyer's property without permission. The same dirt can never be returned.

145.    Boyer prays for actual, consequential, special, incidental damages and attorney's fees and costs.

## ELEVENTH CAUSE OF ACTION

## STATUTE OF LIMITATIONS

## AGAINST ALL DEFENDANTS

146.    All allegations above are hereby realleged.

147.    All allegations and causes of action above carry a six year statute of limitations because they arise out of Defendants' breaches of their general and expressed duties contained in the written and executed contracts as outlined above.  See e.g. *Brigham Young Univ. v. Paulsen Construction Co*., 744 P.2d 1370 (Utah 1987).  And, because it is the nature of the action, and the root of the causes of action that determine the statute of limitations a six year statute of limitations applies in this case to all causes of action regardless of whether the specific cause of action lies in contract or tort.  See. e.g. *Cathco v. Valentiner Crane Brunjes Onyon Architects,* 944 P.2d 365 (Utah 1997).

## PRAYER

WHEREFORE, Respondent requests this court to enter its order for the following:

1.    Attorney's fees and costs

2.    Statutory damages allowed by the acts referenced in the complaint.

3.    Punitive damages.

Boyer Complaint 2.0

4.   $98,416.71 in actual damages plus all monies paid on the note and to Tuhaye Home

Owner's Association for breach of failure to build the Phase 2 Amenities.

5.   Specific performance to rescind the original purchase contract and to place the parties

in the position they were in before execution of the contract.

6.   Joint and several liability.

7.   Treble damages.

8.   Other relief as the court deems proper.

DATED this 11th day of May 2011.


/s/ Matt Wadsworth
Matt Wadsworth, Esq.

Boyer Complaint 2.0